**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MAX V. GUIHUR-COLÓN and HANNAH GUIHUR-COLÓN | Case No. _____ |
| Plaintiffs, | |
| v. | RE: Diversity Jurisdiction; Tort; Breach of Contract |
| UBER TECHNOLOGIES, INC.; RASIER, LLC; UBER PUERTO RICO, LLC; GERARDO CAINS-BORIA; JAMES RIVERS INSURANCE CO.; INSURANCE COMPANIES 1-10, and JOHN DOES 1-10 | |
| Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COME NOW** Plaintiffs Max V. Guihur-Colón ("Max") and Hannah Guihur-Colón ("Hannah") through the undersigned counsel and very respectfully STATE, ALLEGE, and PRAY as follows:

### NATURE OF THE CASE

1. Max was a Presidential Scholar Candidate, a flourishing football player, and actor who had just graduated from high school with honors and was about to go to college at New York University ("NYU"), when he was shot and maimed on May 24, 2022.

2. On that day, Max was leaving a friend's house, after having attended his high school graduation afterparty and decided to take an Uber home. After getting into

the Uber and on his way home, the Uber driver became aggressive and belligerent towards another driver and started a screaming match from car to car with this other driver. The other driver pulled out a firearm and shot Max, who ended up requiring emergency medical treatment and was left with a permanent, disfiguring injury, losing use of his left arm, among other injuries and a long recovery, which prevented him from commencing his college career in September 2022, as planned, and caused NYU to rescind Max's offer of admission.

3.      Were it not for the Uber driver's reckless disregard for Max's life and safety, Max would not have been crippled for life. Thus, Max respectfully complains against the Defendants of caption, and petitions this Court for relief to redress his injuries.

## JURISDICTION & VENUE

4.      This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of different states from all Defendants and the amount in controversy exceeds $75,000.00.

5.      Venue is proper in this District in accordance with 28 U.S.C. §§ 119 & 1391(b)(2) because a substantial part of the events or omissions giving rise to this suit occurred in Puerto Rico.

## THE PARTIES

6.      Plaintiff Max V. Guihur-Colón ("Max") is a citizen of the State of New York and is of legal age under the laws of the State of New York. Max currently resides at 2330

Hoffman St., Bronx, NY 10458 and intends to stay in New York indefinitely.[1] Max is registered to vote in New York, his primary bank account is in New York, attends Fordham University ("Fordham") in New York as a full-time student, has had summer jobs in New York and intends to find permanent employment in New York after completing his studies.

7.    Plaintiff Hannah Guihur-Colón ("Hannah") is a citizen of the State of Louisiana and is of legal under the laws of the State of Louisiana. Hannah currently resides at 2233 Saint Charles Ave., Apt. 502, New Orleans, LA 70130-6318.

8.    Uber Technologies, Inc. ("Uber") is a Delaware corporation with its principal place of business in California. Its physical and mailing address is 1515 3rd Street, San Francisco, CA 94158. Its resident agent in Delaware is National Registered Agents, Inc., whose address is 1209 Orange Street, Wilmington, DE 19801 and whose phone number is 302-658-7581. Uber owns and operates the "Uber" rideshare application and service.

9.    Rasier, LLC ("Rasier") is a Delaware limited liability company whose sole member is Uber. Its physical and mailing address is 1515 3rd Street, San Francisco, CA 94158. Its resident agent in Delaware is The Corporation Trust Company, whose address is Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801 and whose phone

---

[1] Although Max is not yet twenty-one (21) years old — the age of majority in Puerto Rico — his age does not bar him from filing this action on his own. In Rodríguez-Díaz v. Sierra-Martínez, 853 F.2d 1027 (1st Cir. 1988), the First Circuit stated that it "did not think the difference in law between [the plaintiff's] former domicile, Puerto Rico, and New York concerning the age of majority should deny him the right to sue as a citizen of New York in federal court." Id. at 1034.

3

number is 302-658-7581. Rasier is the entity through which Uber hires, pays, and maintains relationships with its drivers.

10.     Uber Puerto Rico, LLC ("Uber PR") is a Puerto Rico limited liability company whose sole member is Uber. Its resident agent is CT Corporation System, located at Ochoa Building, 500 Calle de la Tanca, Suite 514, San Juan, PR, 00901. Uber PR is the entity through which Uber operates in Puerto Rico.

11.     Gerardo Cains-Boria ("Cains") is an employee or otherwise provides services for and is compensated for those services by Uber, Rasier, and/or Uber PR and is the person who agreed to transport Max to his home on May 24, 2022 and whose conduct that day precipitated the events that motivate this Complaint.

12.     James Rivers Insurance Co ("JRI"). is a corporation incorporated in and with its principal place of business in Virginia. It has a designated office at 6641 W Broad Suite 300 Richmond, VA 23230. Its mailing address is P.O. Box 27648, Richmond, VA 23261-7648 and its phone number is (804) 289-2700. JRI issued an insurance policy that covers the events alleged herein.

13.     Insurance Companies 1-10 are unknown insurance companies which have issued insurance policies in favor of any or all the Defendants, whether known or unknown, that cover the claims of caption.

14.     John Does 1-10 are unknown people who participated in the events that motivated this suit and are therefore liable to Plaintiffs. They include, but are not limited to, the unknown third-party who, provoked by Cains, fought him and then shot Max (the "Gunman").

4

## FACTS COMMON TO ALL CAUSES OF ACTION

### The Uber Rideshare Application

15.     Uber owns and operates a mobile application called "Uber" through which application users may request transport between two determined points.

16.     Uber quotes a fare for the rider and, if the rider accepts, advertises the "ride" across its application for drivers and provides the driver with an estimated payment.

17.     The relationship is not between the rider and Uber's driver, but directly with Uber. In fact, Uber does not provide drivers with riders' phone numbers or other contact information and, after all trips are completed, conceals riders' specific pickup and drop-off addresses in drivers' trip histories.

18.     If a driver accepts the rider, Uber then provides the driver with directions to the rider and, upon picking up the rider, furnishes the driver with a route through which to drive the rider and an estimated arrival time.

19.     Uber heavily incentivizes drivers to accept trips. If an Uber driver becomes too selective in his choice of trips, or if he attempts to "cherry-pick" trips to avoid or choose to travel through certain areas, Uber may "lock out" the driver from its application for a timeframe unilaterally set and determined by Uber.

20.     Uber tells drivers where they are required to pick up, and drop-off a passenger. Further, if a driver diverges from the route that Uber provided, Uber re-routes the driver accordingly.

21.     After the rider is dropped off by the driver, Uber allows the rider to provide the driver with a "tip" and to leave reviews. Uber staff purportedly collect and evaluate all reviews of its drivers.

22.     Uber does not require its drivers to have employer identification numbers for payment purposes. In fact, Uber drivers, including Cains, do not file income tax returns claiming their Uber earnings to be from their own businesses, whether as sole-proprietorships, LLCs, partnerships, or any other pass-through arrangement.

23.     Whenever Uber hires a driver, it is supposed to screen him or her through a "multi-step safety screen" before his or her first trip. This safety screen purportedly includes checking drivers for impaired driving and violent offenses. Every year, Uber supposedly reruns these driver screenings and periodically reviews drivers for any issues.

24.     It is not until an Uber driver passes this screening that Uber then furnishes the driver with a contract with Rasier, which is the entity that "hires" the driver.

25.     Uber drivers are not compensated on a per-trip basis. Instead, Uber and its affiliates provide them with weekly paychecks. Rasier—on behalf of Uber—calculates each driver's earnings based on their trips on a weekly basis. Rasier processes drivers' payments the Wednesday after each weekly cycle and pays them out to each driver via direct deposit the following Thursday.

26.     Notwithstanding the fact that Rasier pays these drivers, Uber provides them with weekly "earnings statements" every Monday, which include their fares and reimbursements for tolls and other roadside charges.

27.     Many Uber drivers are well compensated, earning well in excess of the prevailing minimum wage and many earning tens of thousands of dollars yearly. In fact, many of these drivers have dedicated themselves to working for Uber full-time.

28.     As part of their relationship with Uber, Uber allegedly requires drivers to submit up-to-date photographs of themselves, their personal information, and requires them to maintain all relevant licenses and permits up to date.

29.     Uber also states that it requires its drivers to agree to follow certain safety guidelines and represents that it reviews reports of any incidents that occur during a trip. In the event that a driver fails to comply with these guidelines or otherwise incurs in dangerous behavior, Uber has stated that it may take action against the driver, including but not limited to, prescinding of the driver's services.

30.     Uber further mentions that its relationship with its drivers is "at-will," meaning that Uber may unilaterally take any action whatsoever to suspend or terminate that relationship. In fact, Uber uses passengers' ratings of drivers to gauge the latter's performance and quality of service. In the event that a driver does not maintain a certain rating score, which rating score Uber unilaterally sets, Uber suspends drivers or takes other corrective action, up to and including termination of the Uber-driver relationship.

31.     In that vein, Uber regulates and informs drivers how they must treat passengers. It has set standards for cleanliness and presentability of drivers and their cars. Uber also governs how drivers may address and direct themselves towards passengers and, in fact, has identified specific behavior and conducts which Uber prohibits drivers from engaging in the presence of a passenger.

32.     Uber states that it does not allow drivers to hire third parties or subcontract their tasks and duties to third parties.

33.     Uber is also supposed to maintain insurance policies to cover its drivers for incidents involving bodily injury and third-party liability. In fact, Uber has contracted with JRI and other insurance companies, to provide its drivers with insurance policies that are germane to Uber's standards. Cains' policy with JRI is one of these policies.

34.     Based on the above, there exists an employer-employee relationship between Uber, Rasier, Uber PR, and their drivers.

**The May 24, 2022 Incident**

35.     On the evening of May 23, 2022, Max went to a party with his high school classmates in the Condado area of San Juan to celebrate their graduation from high school.

36.     The party had extended to May 24, 2022 and, after it ended, at 3:20 a.m., Max went onto the Uber application to request a ride back to his mother's home in Hato Rey.

37.     Uber accepted the request and assigned Cains as Max's driver. Once Cains arrived at the pickup location, Max stepped into Cains' vehicle, unaware that Cains would proceed to disregard the traffic laws of Puerto Rico, all common sense, and exhibit a level of recklessness far beyond that reasonably possible and also unaware that Uber would suggest a flatly unsafe route.

38.     To wit, the route plotted by Uber did not take Cains through the highways, but instead instructed him to drive Max along Muñoz Rivera Avenue, which becomes a desolate and high crime area at nighttime.

39.     While passing through this area, Cains stopped at a red light and remained there, disregarding the fact that red lights were considered stop signs during that time of night.[2] Max implored Cains to follow traffic laws, treat the red lights as stop signs, and to not to remain stationary. However, Cains gruffly rebuffed Max.

40.     A couple of minutes later, Cains had stopped at *another* red light at the intersection of Muñoz Rivera Avenue and Domenech Street, in Hato Rey.

41.     While Cains remained stationary, a white van with tinted glass passed by Cains' vehicle, zipped through the crosswalk, and immediately stopped.

42.     Cains became incensed, made energetic gestures with his hands towards this unknown driver, and angrily told Max that it was people like him that caused accidents.

43.     The unknown driver saw Cains' gesticulations and reversed towards him. The former rolled down his window. Disregarding all manners of reason and prudence, Cains rolled down his and stared the man down.

44.     Thereafter Cains and the third-party began shouting at each other, escalating with accusations, turning to insults, and culminating with profanities.

---

[2] The Puerto Rico Act of Vehicles and Transit of 2000 states that "[v]ehicles traveling on public highways between twelve (12) midnight and five (5) o'clock in the morning, when facing a red light, shall stop and then continue driving, provided due precautions are taken." P.R. Laws Ann. tit. 9, § 5222(b)(6).

45.     All throughout, Max was paralyzed by fear. He was cowering in the back seat of the car. Notwithstanding and instead of caring for his passenger, Cains decided to keep provoking this third-party.

46.     Cains and the third-party's exchange got so heated that the third-party reached to the side, pulled out a firearm, and the Gunman now pointed it at Cains.

47.     Cains slammed on the accelerator and sped through the same red light he had minutes ago refused to run through.

48.     As Cains sped, Max heard gunfire, followed by severe, blinding pain. Max collapsed, reached to his back, and saw red. He had been shot.

## Damages Suffered by Max and Hannah

49.     Max was in critical condition and required immediate medical assistance. Thus, Cains drove him to the Emergency Room at Pavía Hospital Hato Rey, which was just blocks away.

50.     Upon arrival at Pavía Hospital, the emergency room staff were not able to stabilize Max or perform surgery. Instead, all they were able to do was to stop his internal bleeding and referred him to the Puerto Rico Medical Center in Río Piedras.

51.     Doctors found that Max had been shot in the back, that the bullet had entered through the back, exited the left side of his body, and became lodged in his left arm. Max had suffered significant damage to his skin, muscles, tendons, ligaments, organs, and nerves in the upper-left part of his body. Among the more significant fractures, the bullet had fractured the humerus in Max's left arm.

52.     Instead of enjoying his summer before college, as any other young adult would have done, Max spent the following months in the hospital, being subjected to multiple reconstructive surgeries, in an attempt to save his life and to restore his bodily functions.

53.     Max underwent a first operation on the day of the incident. As part of this operation, Max's doctors performed grafts in the affected areas. These grafts were not just skin grafts, but also blood vessel grafts, to try to restore circulation and save necrotizing tissue.

54.     Max's doctors also found that he had a collapsed lung, due to the path of the bullet, and installed a breathing tube.

55.     Although the doctors were also able to locate the bullet, they were not able to remove it, given that it was too close to the skin graft. The doctors thereafter provided Max with numerous medications.

56.     Max had also suffered from significant blood loss, which loss was significant enough for his family to call for a blood drive in the local media.[3]

57.     The day after the incident, May 25, 2023, Max underwent a second operation. Max's doctors performed a fasciotomy, a "limb-saving procedure" through which an open gash is left, to relieve tension or pressure in order to treat the resulting loss of circulation to an area of tissue or muscle. In this case, the fasciotomy was intended to salvage what remained of Max's left arm.

---

[3] See, e.g., Solicitan Donantes de Sangre para Estudiante que Fue Herido de Bala tras Celebrar su Graduación, WIPR (May 25, 2022), https://wipr.pr/solicitan-donantes-de-sangre-para-estudiante-que-fue-herido-de-bala-tras-celebrar-su-graduacion/.

58.     Notwithstanding, Max remained in the hospital recovering for various weeks, and even caught COVID-19 while convalescing.

59.     Max was eventually discharged weeks after his incident, but he could not even return to his mother's home. Instead, Max was referred to an in-patient physical rehabilitation center.

60.     By June 10, 2022, Max had been diagnosed with paresthesia in his left arm, a condition that is often indicative of nerve damage. In fact, since the incident, Max lost use of his left arm.

61.     Moreover, Max was forced to postpone his college plans. He was in no condition to commence his studies at NYU by August 2022, as planned. Therefore, he asked NYU to defer his admission to 2023, which NYU refused to do. Additionally, after paying medical bills, affording NYU was impossible. Max had to settle for commencing his university studies at Fordham, a well-known university, but without the same prestige and name recognition as NYU.

62.     After months of rehabilitation, Max left Puerto Rico for New York City, where he continued receiving medical treatment.

63.     It was not until September 16, 2022, that Max was able to undergo surgery at Columbia University Irving Medical Center to remove the bullet from his body and to see if it was possible to repair his damaged nerves.

64.     The neurosurgeon found a "large amount of scar" around the medial antebrachial cutaneous nerve, medial brachial cutaneous nerves, radial nerve, and ulnar nerves.

65.     Notwithstanding, he was then able to identify the median nerve in the proximal upper arm. He attempted to stimulate the nerve, but it provided no response. The nerve was dead.

66.     Upon further dissection, the neurosurgeon found a large amount of vascular structure, which he presumed to represent collateral circulation and venous drainage in the area, most likely from the bullet wound.

67.     Eventually, the neurosurgeon was able to dissect the median nerve above and below the area of the injury. It felt hard at both locations and exhibited a "full-thickness scar" at both levels.

68.     However, each of the median nerve's fascicles was hard and scarred without viable tissue, and, because there was nonviable nerve tissue at both ends, the neurosurgeon abandoned further efforts to repair Max's median nerves.

69.     This procedure confirmed the fact that Max suffered permanent injuries at the age of 18, from which he will continue to suffer for the rest of his life. Max will never be able to recover full use of his left arm.

70.     In addition to the physical injuries which Max suffered, he has also suffered from significant pain and anguish. Due to the emotional trauma which he suffered, Max fears for his life on a daily basis. He no longer felt safe in Puerto Rico, and permanently relocated to New York, to obtain some modicum of peace of mind. Regardless of this relocation, Max suffers from significant emotional episodes.

71.     Moreover, because of the permanent injury which left his left arm without use, Max has suffered considerable damages to his self-esteem and self-worth. Max has

been left permanently crippled, with an arm that not only no longer functions, but is also significantly disfigured. Max's arm has atrophied beyond normal, and Max requires a compression sleeve to even have some control over his arm. Regardless, Max's disfigurement is an ever-living reminder of the incident Max survived and which reminder he will continue seeing for the rest of his life. Additionally, Max's insecurities about his appearance — which are normal problems for most teenagers and young adults — have skyrocketed.

72.     More importantly, Max has suffered significant economic damages in addition to the significant medical costs required to reach maximum medical recovery.

73.     Max had to postpone his university studies, due to his precarious medical state after the incident and the battery of surgeries, treatments, and rehabilitation efforts to which he was subjected. In other words, Max will now be entering the workforce at a later age, limiting his productivity.

74.     Moreover, the extent of the injuries suffered by Max, including the pain and anguish to which he was subjected, may also result in lesser academic performance. Since academic grades are an indicator of future potential and academic grades are also a significant factor for hiring decisions, this former presidential scholar candidate's marketability and ability to enter the workforce are now hamstrung by the incident narrated above.

75.     Further, Max had originally intended to enroll in NYU. However, because of the incident, as explained above, he subsequently enrolled in Fordham. Although a

good university by itself, a Fordham degree is less prestigious and valuable than an NYU degree, which further damages Max's future career prospects and earning potential.

76.     Max's permanent injury has also forced him to abandon many of his prior hobbies and extracurricular activities, including football and acting. This, compounded with the fact that Max is permanently scarred and mutilated, is gut-wrenching and only fuels Max's feelings of insecurity and inadequacy.

77.     Hannah was also left distraught and inconsolable by the injuries suffered by her younger brother. She has been supporting Max every minute since the incident occurred, continuously consoling her younger brother, and providing him with all possible manners of emotional support. The incident and its fallout, however, have left Hannah emotionally exhausted, mentally drained, and psychologically damaged as well.

78.     Altogether, Max and Hannah estimate that they have suffered no less than $5,000,000.00 in damages, including physical injury, pain and anguish, and economic damages. However, because Max has been subjected to permanent, lifetime damage, this amount will increase with time once the full extent of Max's damages becomes clear.

**Prior Suit and Tolling of the Statute of Limitations**

79.     On May 23, 2023, Plaintiffs filed suit against the same Defendants of caption in the matter of <u>Guihur-Colón v. Uber Techs. Inc.</u>, No. 3:23-cv-01264-RAM (D.P.R.). Upon motion by Plaintiffs, this matter was dismissed *without* prejudice on September 8, 2023.

80.     In accordance with Puerto Rico case law, the statute of limitations for Plaintiffs' claims was tolled by filing this earlier action and began to run anew on October 9, 2023. <u>See</u> <u>Ross Valedón v. Hosp. Dr. Susoni Health Cmty. Health Servs., Corp.</u>, 2024

TSPR 10, at *19 (P.R. 2024) (slip op.) (holding that the filing of a complaint tolls the statute of limitations, which only begins to run anew on the date when the judgment dismissing the complaint without prejudice becomes final and unappealable).

## FIRST CAUSE OF ACTION: NEGLIGENCE
**(Directed at Gerardo Cains-Boria; Uber; Rasier; Uber PR, and John Does 1-10)**

81.     Plaintiffs restate herein and incorporate by reference the preceding allegations.

82.     Article 1536 of the Puerto Rico Civil Code provides that whoever causes injury to another through fault or negligence is obligated to redress it. P.R. Laws Ann. tit. 31, § 10801.

83.     Cains was negligent when transporting Max. He refused to follow traffic directives in a desolate, high crime area that would have allowed him to speedily drive Max to his home and avoid starting a shouting match that led to Max being shot.

84.     Had Cains not engaged the Gunman, Max would not have suffered any of the injuries herein described. Therefore, Cains is obligated to redress Max's injuries.

85.     Uber, Rasier, and Uber PR are also liable for Cains' conduct. As described above, Uber, Rasier, and Uber PR have obliged themselves to provide Uber riders with a safe environment and, therefore, vet, review, and supervise their drivers and ensure that they follow certain safety guidelines while transporting passengers.

86.     Uber, Rasier, and Uber PR did not adequately train Cains to follow these guidelines, nor did they adequately enforce them, or supervise Cains in his compliance therewith. Had Uber, Rasier, and Uber PR trained Cains, adequately enforced these

guidelines, or properly supervised Cains, he would not have engaged the unknown Gunman in the shouting match that led to Max's injuries.

87.    Further, Uber, Rasier, and Uber PR also provide routes for drivers to take. However, on the night in question, these Defendants provided Cains with a route that took him through a desolate, high-crime environment. Had Uber, Rasier, and Uber PR not provided Cains with this route, this incident would have been avoided.

88.    All the aforementioned Defendants are jointly and severally liable ("*solidariamente responsables*") for Max's injuries.

89.    John Does 1-10 are also liable to the injuries caused to Max, including those inflicted by the Gunman.

## SECOND CAUSE OF ACTION: VICARIOUS LIABILITY
### (Directed at Uber, Rasier, and Uber PR)

90.    Plaintiffs restate herein and incorporate by reference the preceding allegations.

91.    Article 1540 of the Puerto Rico Civil Code states that employers are liable for the injuries causes by employees within the service of their branches or in the course of their employment. P.R. Laws Ann. tit. 31, § 10805.

92.    Uber, Rasier, and Uber PR were Cains' employer at all relevant times.

93.    Cains acted within the scope of his employment at all relevant times, including but not limited to, the moment in which Max suffered the injuries that motivated this Complaint.

94.     Pursuant to Article 1540, Uber, Rasier, and Uber PR are liable for the injuries caused to Max and are required to redress them.

95.     To the extent that Uber, Rasier, and Uber PR may claim that Cains was an independent contractor, that claim would still not relieve them from liability.

96.     Under Puerto Rico law, the employer of an independent contractor is liable for the injuries suffered by third parties due to the independent contractor's negligence in failing to undertake precautionary measures against the particular risks inherent to a specific work.  Pons Anca v. Engebretson, 160 P.R. Dec. 347, 357 (2003) (quoting López v. Cruiz Ruiz, 131 P.R. Dec. 694, 706 (1992)).

97.     In this case, Cains knowingly transported Max through a desolate, high-crime area past 3 a.m., taking the route that Uber had provided. Cains had to undertake reasonable measures to ensure Max's safety throughout the trip, including obeying traffic laws that allowed him to drive past red lights, and not provoking a vehicle with tinted glass that had been driving aggressively, and whose driver had a gun.

98.     Cains failed to undertake these reasonable measures and, because he failed to do so, Uber, Rasier, and Uber PR are liable for the resulting damages.

99.     In the alternative, Cains' relationship with Uber, Rasier, and Uber PR, whereby Cains provided transportation services and Uber, Rasier and Uber PR provided technological and logistical support constituted a joint enterprise, since they all agreed to divide costs and share profits resulting from Cains' trips.

100.    Where parties constitute a joint enterprise and share profits from that joint enterprise, all members of the joint enterprise are liable for the acts committed by one of

18

its members in furtherance of that enterprise. <u>See</u> <u>Suárez-Matos v. Ashford Presbyterian</u> <u>Cmty. Hosp.</u>, 4 F.3d 47, 52 (1st Cir. 1993) (discussing <u>Márquez Vega v. Martínez Rosado</u>, 116 P.R. Dec. 487 (1985)).

101.    Cains' acts in providing a trip to Max were in furtherance of any joint enterprise with Uber, Rasier, and Uber PR. Therefore, these entities are liable for Cains' negligent acts during that same trip.

### THIRD CAUSE OF ACTION: INSURANCE LIABILITY
### (Directed at JRI and Insurance Companies 1-10)

102.    Plaintiffs restate herein and incorporate by reference the preceding allegations.

103.    Article 20.010 of the Puerto Rico Insurance Code states that an insurer who issues a policy insuring a person against damages due to legal liability for bodily injury, death, or property damage to a third person shall be liable where a covered loss occurs. P.R. Laws Ann. tit. 26, § 2001.

104.    Article 20.030 provides the injured person with a direct cause of action against the insurer, without prejudice to any action the injured person may file against the insured. P.R. Laws. Ann. tit. 26, § 2003.

105.    Defendants James Rivers Insurance Company and Insurance Companies 1-10 have issued insurance policies in favor of the other Defendants, which policies cover the claims at bar. Consequently, Defendants James Rivers Insurance Company and Insurance Companies 1-10 are liable for Plaintiffs' injuries in accordance with the terms of their insurance policies.

19

## FOURTH CAUSE OF ACTION: PUNITIVE DAMAGES
### (Directed at All Defendants)

106.    Plaintiffs restate herein and incorporate by reference the preceding allegations.

107.    Article 1538 of the Puerto Rico Civil Code provides for double punitive damages, if the tortious act or omission is a crime, is made with *dolus* or with reckless disregard to life, safety, and private property. P.R. Laws Ann. tit. 31, § 10803.

108.    Cains' actions in starting a fight past 3 a.m. while transporting Max were made with reckless disregard for the latter's life. Similarly, the Gunman's discharge of his firearm, aimed at the car carrying Max, was also made with reckless disregard for Max's life. Consequently, the Court should award double damages for the injuries suffered by Max.

## FIFTH CAUSE OF ACTION: DAMAGES FOR FAMILY MEMBER'S EMOTIONAL DAMAGES
### (Directed at all Defendants)

109.    Plaintiffs restate herein and incorporate by reference the preceding allegations.

110.    The Puerto Rico General Tort Statute confers the relatives or loved ones of a tortiously injured individual with a cause of action against the alleged tortfeasor for emotional damages suffered by the relatives or loved ones. See Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 24 (1st Cir. 2009) (quoting Méndez-Matos v. Municipality of Guaynabo, 557 F. 3d 36, 37 (1st Cir. 2009)).

111.    The tortious conduct described above has caused Hannah emotional harm. In accordance with the Puerto Rico General Tort Statute, Hannah is entitled to an award of damages corresponding to and in redress for this emotional harm.

112.    Further, and because the tortious conduct described above was made with reckless disregard to Max's life, Hannah is also entitled to punitive, double damages. <u>See</u>. P.R. Laws Ann. tit. 31, § 10803.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs hereby demand that all issues raised in this Complaint be tried by a jury.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs respectfully asks the Court to enter Judgment against Defendants, providing the following relief:

- An award of compensatory damages of no less than $5,000,000.00;

- An additional award of punitive damages, for a total global amount of $10,000,000.00, and

- All other relief which the Court considers proper under law or in equity.

**RESPECTFULLY SUBMITTED**, in Guaynabo, Puerto Rico, this 7th day of May 2024.

**OLMO Y RODRÍGUEZ-MATÍAS LAW OFFICE, PSC**
261 Ave. Domenech, SJ PR 00918
787.758.3570/Jrolmo1@gmail.com

s/José R. Olmo Rodríguez
José R. Olmo Rodríguez
USDCPR #213405

21

-and-

**MONSERRATE SIMONET &
GIERBOLINI, LLC**
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968
Tel. (787) 620-5300 | Fax (787) 620-5305

*s/ Dora L. Monserrate-Peñagarícano*
Dora L. Monserrate-Peñagarícano
U.S.D.C.- P.R. No. 212,612
Email: dmonserrate@msglawpr.com

*s/ Fernando J. Gierbolini-González*
Fernando J. Gierbolini-González
U.S.D.C. – P.R. No. 211,901
Email: fgierbolini@msglawpr.com

*Attorneys for Plaintiffs Max and Hannah
Guihur-Colón*